UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| ELIZABETH JONES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 6:26-cv-00055-GFVT-HAI |
| | ) | |
| v. | ) | **OPINION** |
| | ) | **&** |
| JENKINS INDEPENDENT SCHOOL | ) | **ORDER** |
| DISTRICT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

A public school in Eastern Kentucky issued a series of no trespass bans to Elizabeth Jones, a parent, in response to some of her posts on Facebook. As explained below, these posts were mean and demeaning. Naturally, several parents complained to the school district. The school district responded by banning Jones from all district property.

Jones seeks to preliminarily enjoin the enforcement of these bans, arguing that they violate the First Amendment to the United States Constitution. This case pits two important issues against each other. The school district seeks to maintain control of its premises by preventing physical access to a parent who has made tasteless social media posts, arguing that parents do not enjoy an unqualified right to access school property and that the no trespass bans do not implicate the First Amendment. Jones, on the other hand, alleges that the school district retaliated against her protected speech.

So, is the speech at issue here protected? The law is clear: The First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech, and this speech is protected. For these reasons, the Court **GRANTS** Jones's motion for a preliminary injunction.

**I**

Plaintiff Elizabeth Jones is a resident of Letcher County, Kentucky. [R. 32 at 2]. She is a single mother of two minor children who attend school in the Jenkins Independent School District. [*Id.*] She regularly attends school-sponsored activities, including athletics events, and donated her time and money to support her children's extracurricular activities. [*Id.* at 3].

Jones is also the owner and CEO of Hillbilly Crime, LLC.[1] [R. 37 at 2]. According to Hillbilly Crime's YouTube profile, Jones is a "Mom and self-proclaimed 'Educated Hillbilly'" who discusses "anything & everything True Crime, follow[s] local criminal trials, and give[s] my personal and best 'Hillbilly' commentary on important issues and current events."[2] Jones monetizes her content through this YouTube channel with over 26,000 subscribers and also through two Facebook pages with over 26,000 followers and 38,000 followers, respectively.[3] [R. 37 at 2]. In addition to her videos and posts, Jones operates an online store featuring Hillbilly Crime merchandise and also offers supporters the ability to purchase subscription tiers ranging from $2.99 to $24.99 a month to support her reporting. Jones is a prolific user of Facebook, publishing multiple posts per day on both her "Elizabeth Jones" and "Hillbilly Crime" accounts. The accounts largely overlap in terms of content. When Jones posts on her "Elizabeth Jones" account, she often leaves a comment encouraging her supporters to subscribe and support her

---

[1] *See also Hillbilly Crime LLC*, Ky. Sec. of State Michael G. Adams (June 24, 2026, at 14:20 ET), sosbes.sos.ky.gov/BusSearchNProfile/Profile.aspx?ctr=1437557 [https://perma.cc/TMV5-2Z3B]. According to the Kentucky Secretary of State's business entity search, Hillbilly Crime LLC is an active, for-profit Kentucky limited liability company in good standing. The Secretary of State's office lists Elizabeth Jones as the LLC's registered agent.
[2] Hillbilly Crime, YouTube (June 24, 2026 at 14:27 ET), https://www.youtube.com/@HillbillyCrime [https://perma.cc/WM8T-KL9M].
[3] *Elizabeth Jones*, Facebook (June 24, 2026, at 14:32 ET), https://www.facebook.com/HillbillyCrime/ [https://perma.cc/WD3E-9XAG]; *Hillbilly Crime*, Facebook (June 24, 2026, at 14:35 ET), https://www.facebook.com/p/Hillbilly-Crime-61577558710974/ [https://perma.cc/6T9R-WYU7].

work with links to purchase the tiered subscription options. In addition to posting about local crime, Jones also posts about school athletics from her main account.

The Defendants allege that Jones relies on controversy to drive engagement with her channels. [R. 37 at 2]. On November 26, 2025, Jones posted a comment where she poked fun at a middle school child's appearance and accused an opposing basketball coach of making derogatory gestures to fans and parents. [R. 33-5 at 2]. She then responded aggressively to another Facebook user who defended the child. [*Id.*] On December 13, 2025, she made another post criticizing a child's effort in a basketball game and encouraged others to comment on her post. [*Id.* at 3]. Both posts contained photographs of the minor children at issue, although the parties' attachments did not include the photos as part of their exhibits submitted to the Court. Jones does not contest that the posts contained photographs, so the Court assumes that the posts in fact included photos of the minor children. *See* [R. 39 at 8 (Plaintiff noting in her Reply Brief that the access bans were in response to posts containing photographs)].

The school district claims they received numerous complaints from parents concerned about Jones's online activity. [R. 37 at 3]. Defendant Damian Johnson, the school district's superintendent, then issued a "No Trespass Order" on December 15, 2025. [*Id.* at 4; R. 33-1 at 2]. This order read as follows:

> Due to your multiple posts on social media of students participating in extracurricular activities which appear to be harassment and which have caused disruptions of the educational process in this school district, you are banned from any and all properties owned or leased by this school district and banned from any and all activities sponsored for or by this school district.
>
> It is of utmost importance to provide for the safety and well-being of our students, our fans, our visitors and those who use the school district facilities and attend school district activities.

3

> If you are present on any property owned or leased by this school district or present at activity [sic] sponsored by or for this school district, the school district will have you removed by law enforcement and then the school district will seek criminal trespass charges against you.

[R. 33-1 at 2]. Jones received no warning before the district issued the No Trespass Order. [R. 33-4 at 13–14].

Jones, with the assistance of counsel, filed this lawsuit on January 5, 2026, challenging the No Trespass Order as violative of the First and Fourteenth Amendments. [R. 1]. She also moved for a temporary restraining order and a preliminary injunction. [R. 2]. The Court denied the motion for a temporary restraining order on January 12, 2026. [R. 6]. In that order, the Court stated that it would order expedited briefing after the defendants appeared in the case. [*Id.* at 4].

Developments outside of the parties' control prevented that expedited briefing from occurring.[4] The various defendants appeared in early February, and the defendants filed two motions to dismiss. By this time, however, the Court became aware that then-Plaintiff's counsel was at risk of losing her ability to practice before the Eastern District due to compounding issues across several open cases. On February 27, 2026, Chief Judge David L. Bunning suspended Plaintiff's counsel from practicing in the Eastern District for a one-year period. On March 13, 2026, the Court entered an order removing that attorney as Plaintiff's counsel and gave Jones thirty days to acquire new counsel or to proceed *pro se* without an attorney. [R. 20]. On March 31, 2026, Jones' new counsel made their appearances before the Court. [Rs. 21–23].

---

[4] The decision to pause any "expedited briefing" was the Court's alone in light of the developments surrounding then-Plaintiff's counsel. Plaintiff now takes issue that this "expedited briefing" period did not begin as soon as Defendants appeared. [R. 33 at 5–6]. But to have ordered briefing when the Court was aware of the circumstances surrounding then-Plaintiff's counsel would have led to wasted time and effort by both the parties and the Court. This is evidenced by the fact that since Plaintiff acquired new counsel, she has dismissed two frivolous defendants, amended her complaint, and filed a renewed motion for a preliminary injunction.

The Defendants, after appearing in this lawsuit, then issued a Modified No Trespass Order to Jones on February 5, 2026. [R. 33-2 at 2]. The Modified Order carved out exceptions to its December order, permitting Jones to drop off and pick up her children from school, deliver items to them at school, attend scheduled parent-teacher conferences, and attend other scheduled meetings with educators relating to her children. [*Id.*] The modified order also clarified that the ban did not apply to meetings of the school board pursuant to Ky. Rev. Stat. § 61.810(1). [*Id.*] Like the first order, this modified order did not specify with any particularity which social media posts led to the ban and did not list any way that Jones could challenge it.

After obtaining new counsel, Jones dismissed her claims against two of the original defendants and entered an Agreed Order with the remaining Defendants which withdrew the pending motions and set a new briefing schedule. The parties conducted their Rule 26(f) meeting, and the Court entered a scheduling order on April 28, 2026. [R. 30]. On May 26, 2026, Jones filed her amended complaint and a new motion for a preliminary injunction. The amended complaint brings eight causes of action, including for First Amendment retaliation, a facial challenge to both orders as content-based restrictions, and facial challenges to both orders for overbreadth and vagueness. [R. 32 at 9–17]. The Defendants filed their answer to the amended complaint and their Response Brief to the preliminary injunction motion on June 16, 2026. [Rs. 36, 37]. On June 30, 2026, Jones filed her Reply Brief in support of her motion for a preliminary injunction. [R. 39]. The motion is now ripe for adjudication.

**II**

A preliminary injunction is an extraordinary remedy. *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). To secure a preliminary injunction, "a plaintiff must make a clear showing that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

5

the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (citation modified). Because such a remedy "is never awarded as of right, the plaintiff must make a clear showing that these factors favor him." *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (quoting *Starbucks,* at 345). No one factor is dispositive, as "each of these factors should be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014) (citation modified). But "when a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). Although the first prong is normally determinative in an injunction seeking to stop a defendant's allegedly unconstitutional actions, "the demonstration of some irreparable injury is a *sine qua non* for issuance of an injunction." *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002).

The Federal Rules of Civil Procedure direct that "[t]he court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). The Sixth Circuit interprets this requirement "to imply a hearing in which the defendant is given a fair opportunity to oppose the application and prepare for such opposition." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552 (6th Cir. 2007). The Sixth Circuit, however, only requires a hearing "when there are disputed factual issues, and not when the issues are primarily questions of law." *Id.* (citing *Lexington-Fayette Urban County Gov't v. BellSouth Telecomm., Inc.*, 14 F. App'x 636, 639 (6th Cir. 2001)). The Sixth Circuit adopted the rule first announced by the Eleventh Circuit, holding that:

6

> Where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held. However, where material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing.

*Id.* at 553 (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312–13 (11th Cir. 1998)). There are no material facts in dispute, and so the Court declines to hold an evidentiary hearing. The parties clash over whether Jones's conduct constitutes a form of protected speech, which is a question of law. *Cocchini v. City of Franklin, Tennessee*, 785 F. Supp. 3d 273, 290 (M.D. Tenn. 2025) (citing *Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456, 464 (6th Cir. 2017)); *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983) (the categorization of speech is a question of law).

The Court will address the preliminary injunction motion by answering the following questions: (A) whether the December 2025 "No Trespass Order" is moot; and (B), whether the application of the four-part injunction analysis warrants the grant of a preliminary injunction in this case.

## A

As an initial point, Jones argues that the December 2025 "No Trespass Order" is not moot simply because the Defendants issued a modified order. [R. 33 at 7–10]. The Defendants do not address this argument in their Response Brief. "An argument not addressed in a responding party's brief is deemed waived." *Henry v. Roane Cty.*, No. 3:16-CV-689, 2018 U.S. Dist. LEXIS 89025, at *31 (E.D. Tenn. May 29, 2018); *see also United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Even had the Defendants

7

objected in some way to this argument, the Court agrees with Jones that both no trespass orders fall within the scope of this Court's review.

"A defendant's voluntary cessation of a challenged practice does not deprive the court of power to determine its legality." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). In determining whether a particular aspect of a case has been mooted by the defendant's voluntary conduct, the Court asks, "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (citing *United States v. Concentrated Phosphate Export Assn., Inc.,* 393 U.S. 199, 203 (1968)). Here, the subsequent events make it absolutely clear that the allegedly wrongful behavior would recur, albeit with some limited carveouts. The Defendants expressly reserve the right to reimpose a complete ban without the exceptions found in the modified no trespass order. [R. 33-3 at 2 ("The Board maintains its right to enforce all Board policies which may result in additional restrictions including, but not limited to, implementation of a total ban.")]. The Defendants maintain that their actions are completely legal and have signaled that they intend to litigate this question fully. *See Speech First, Inc. v. Schlissel*, 939 F.3d 756, 770 (6th Cir. 2019) (stating that the government's vigorous defense of its acts is important to the question of mootness). The constitutionality of both the original No Trespass Order and the Modified No Trespass Order is properly before the Court. The Court next turns to the four-factor test for evaluating preliminary injunctions. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

**B**

**1**

The first prong of the preliminary injunction analysis is often the predominant consideration because "a finding that there is simply no likelihood of success on the merits is

usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). This is particularly true where a plaintiff alleges a constitutional violation, where the likelihood of success on the merits is usually determinative. *Obama for Am.*, 697 F.3d at 436.

The parties dispute the nature of the No Trespass Order and the Modified No Trespass Order. Jones characterizes both orders as facially invalid content-based restrictions on speech that lack narrow tailoring and fail under strict scrutiny. [R. 33 at 12–13]. The Defendants' main argument advances the theory that the orders do not restrict Jones' speech at all and merely reflect the school board's authority to bar Jones from school property, a decision that does not implicate the First Amendment. [R. 37 at 6–10]. Alternatively, the Defendants argue that Jones' speech is commercial speech which enjoys less protection under the First Amendment. [R. 37 at 10–16]. Under this alternative argument, the Defendants suggest that the school board's decision to ban Jones from school property is permissible under the intermediate scrutiny standard because the ban serves a substantial governmental interest and is narrowly tailored to serve that interest. [*Id.* at 10].

To determine whether Jones is likely to succeed on the merits, the Court must first answer whether the ban reaches the First Amendment at all. If it does, then the Court must determine whether Jones has sufficiently shown her likelihood of success on the merits under the relevant causes of action.

**i**

Parents do not enjoy an unfettered right to access public school property. *Johnson v. Perry*, 859 F.3d 156, 173 (2d Cir. 2017) (parents do not hold a "limitless" First Amendment right of access to school property); *Lovern v. Edwards*, 190 F.3d 648, 656 (4th Cir. 1999) (ban from school property did not violate parent's First Amendment rights where the school "did not seek

to affect Lovern's conduct except on [school] property"); *Davison v. Rose*, 19 F.4th 626, 641 (4th Cir. 2021) (recognizing that *Lovern* "establishes the constitutionality of no-trespass bans against parents attempting to enter school grounds," and affirming qualified immunity on that basis). District courts across the Sixth Circuit recognize this principle. *Bonds v. Walton Verona Indep. Bd. of Educ.*, No. CV 15-53-DLB-CJS, 2016 WL 11432140, at *4 (E.D. Ky. Feb. 16, 2016) (banning plaintiff from entering school board premises outside the context of a public board meeting did not violate the First Amendment); *Cwik v. Dillon*, No. C-1-09-669, 2010 WL 5691404, at *6 (S.D. Ohio Sept. 20, 2010) ("Plaintiff's liberty interest in directing the education of his children does not extend to a constitutional right to unlimited attendance into or onto the building and grounds of his children's school"). Indeed, "courts routinely dismiss [constitutional] claims when schools, like the District here, prohibit parents from entering school property after the parent behaves inappropriately at school[.]" *Wheatley v. Boardman Loc. Schs., Dist. Bd. of Educ.*, No. 4:21-CV-1831, 2022 WL 2291703, at *7 (N.D. Ohio June 24, 2022). School districts have clear authority to ban third parties, including parents, from attending events on school property "in order to ensure a safe environment and prevent disruption of school events[.]" *Spurlock v. Ashland Indep. Sch. Bd. of Educ.*, No. 23-124-DLB-EBA, 2024 U.S. Dist. LEXIS 135313, at *17 (E.D. Ky. July 31, 2024).

Kentucky law specifically provides that every board of education "shall have general control and management of the public schools in its district." Ky. Rev. Stat. § 160.290(1). Each board "shall have control and management of all . . . public school property of its district[.]" *Id.* In Kentucky, "school boards have general policymaking authority with regard to the . . . general management of the schools," including the use of school property. *Thorpe v. Breathitt County Bd. of Educ.*, 8 F. Supp. 3d 932, 939 (E.D. Ky. 2014). Additionally, in 1990 then-Attorney

10

General Frederic J. Cowan issued an Opinion of the Attorney General (OAG) stating that "with limited exceptions as provided for open meetings of public agencies in KRS 61.840, we are of the opinion that a local school board may prohibit non-students from entering upon school property, irrespective of the nature of activities which at the time are being conducted upon the property."[5] 1990 Ky. AG LEXIS 11, at *1–2 (Feb. 12, 1990). While this OAG is nearly 40 years old and not dispositive, the Court's research did not discover a subsequent OAG that contradicts the 1990 opinion.

Equally present, however, is the general rule that a state actor cannot retaliate against an individual for speech that the state disfavors. *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 585–86 (6th Cir. 2008) (listing elements of First Amendment retaliation claim). Speech is not constitutionally protected only when it touches upon a matter of public concern but rather is "generally protected by the First Amendment, with restrictions on only limited types of speech, such as obscenity, defamation, and fighting words." *Id.* at 586, 588 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 382–83 (1992)); *see also McElhaney v. Williams*, 81 F.4th 550, 557 (6th Cir. 2023) ("other than a few limited areas, almost all speech is protected from governmental interference"). The First Amendment "applies to loathsome and unpopular speech with the same force as it does to speech that is celebrated and widely accepted." *Bible Believers v. Wayne County, Michigan*, 805 F.3d 228, 243 (6th Cir. 2015) (en banc). Speech that is not obscene, defamatory, or inciting violence does lose its protected status simply because it has "profoundly unsettling effects." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). And relevant to the no trespass orders issued in this case, "the First Amendment prohibits government officials from

---

[5] "Opinions of the Attorney General (OAGs) do not have the force of law, but they are persuasive and public officials are expected to follow them." *Opinions of the Attorney General*, Office of the Attorney General (June 25, 2026, 16:37 ET), https://www.ag.ky.gov/Resources/Opinions/Pages/default.aspx [https://perma.cc/VD2B-29EP].

11

subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019).

The Sixth Circuit recently addressed a situation involving parental speech in *McElhaney v. Williams*. There, the defendant school officials banned the plaintiff parent from attending softball games for a single week after he sent text messages to his daughter's coach criticizing the coach's managerial decisions. *McElhaney*, 81 F.4th at 553. McElhaney sued the school officials, arguing that they retaliated against him for criticizing his daughter's coach. *Id.* Because the district court resolved the case on the basis of qualified immunity, the Circuit Court had to ask whether a reasonable school official would have understood that McElhaney's speech was protected. *Id.* at 557.

The Court held that a reasonable school official would have known that the law protected McElhaney's speech. Recounting that "almost all speech is protected" and that McElhaney's speech did not fall into that "short and somewhat notorious list" of unprotected speech, the Circuit reversed the district court's grant of summary judgment to the defendants. *Id.* at 560. The Sixth Circuit noted that McElhaney enjoyed "clearly established rights as a parent speaker" and that any ban of McElhaney from school events that had a retaliatory motive "would be at odds with the First Amendment." *Id.* at 559. The panel also agreed that the "disruption standard applicable to student speech" does not normally apply to the speech of parents. *Id.* at 558–59 (explaining that the disruption standard applies to students in the context of the special characteristics of the school environment).

Unless a parent's speech falls into one of the historic and traditional categories permitting content-based restrictions, including speech expressed as part of a crime, obscene expression, incitement, or fraud, then schools cannot regulate the content of that speech. *Id.* at 557 (citing

12

*United States v. Alvarez*, 567 U.S. 709, 717, 720 (2012)). Jones' posts clearly do not reach this level. She posted arguably distasteful commentary about opposing student athletes, but none of it falls within the "limited areas" where the state can regulate speech. *Novak v. City of Parma*, 932 F.3d 421, 427 (6th Cir. 2019). It is true that her social media posts "offend[ed] the sensibilities of others," including other parents. *Higgins v. Ky. Sports Radio, LLC*, 951 F.3d 728, 734 (6th Cir. 2020). But offensive speech still enjoys First Amendment protection, and the school district cannot sanction the content of Jones' speech merely because they find it unsettling, distasteful, or inappropriate. Accordingly, both the "No Trespass Ban" and the "Modified No Trespass Ban" implicate the First Amendment.

**ii**

Jones' Amended Complaint [R. 32] brings both First Amendment retaliation claims (Causes of Action 1 and 2) as well as facial challenges to the alleged content-based restrictions (Causes of Action 3–8). For the reasons that follow, the Court determines that Jones is likely to prevail on her First and Second causes of action under the theory of First Amendment retaliation. It is unnecessary, then, to evaluate the remaining causes of action at this stage.

Jones alleges that the Defendants retaliated against her in violation of the First Amendment. There are three elements to a retaliation claim:

> (1) the plaintiff was engaged in a constitutionally protected activity;
>
> (2) the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and
>
> (3) the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

13

*Jenkins*, 513 F.3d at 585–86. As to the first element, Jones engaged in a constitutionally protected activity. *Id.* at 588 ("Speech is generally protected by the First Amendment, with restrictions on only limited types of speech . . . none of which is applicable here").

In weighing the second element, the Court notes that the test is an objective one, and it does not matter whether Jones herself was actually deterred by the district's retaliation.[6] *Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010). Neither party meaningfully addresses this prong of the retaliation test. But a blanket ban against a parent in reaction to posting on social media constitutes a negative consequence beyond the de minimis level and would likely chill or silence a person of ordinary firmness from posting in the future. *Sensabaugh v. Halliburton*, 937 F.3d 621, 628 (6th Cir. 2019). All parents want to be involved in their children's lives, and particularly in their extracurricular activities at school. A ban such as this—unlimited in time and with no listed appeal procedures—certainly would chill a person of ordinary firmness from continuing to exercise their speech rights, particularly where the alternative is total isolation from their children's activities.

The third factor asks whether the adverse action was motivated at least in part as a response to the exercise of Jones' constitutional rights. A "motivating factor . . . is one without which the action being challenged simply would not have been taken." *Holzemer*, 621 F.3d at 525 (citing *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002)). Here, there is no question that the Defendants instituted the ban as a direct result of Jones' posts. They say so themselves: "The No Trespass Order here was issued due to concerns with Ms. Jones's social media activity and resulting disruption of school operations[.]" [R. 33-4 (Defendant Damian Johnson's Answers and

---

[6] The Defendants claim that Jones violated the Modified Trespass Order before the Defendants temporarily suspended its imposition for the remainder of the 2025-26 school year. [R. 37 at 5]. Jones also continued to post commentary about school athletics on Facebook. [*Id.* at 4].

14

Responses to Plaintiff's First Set of Interrogatories)]. Accordingly, it is undisputed that the bans would not have occurred but for Jones' social media posts, which are a form of protected speech unreachable by the school district as a governmental body. Jones has shown she is likely to succeed on the merits of her First Amendment retaliation claim, weighing heavily in favor of issuing the preliminary injunction. *Obama for Am.*, 697 F.3d at 436.

**2**

The second factor—whether Jones would suffer irreparable harm if the preliminary injunction were denied—also weighs in favor of granting the motion. Jones is correct that the violation of First Amendment freedoms constitutes an irreparable injury sufficient to justify the grant of a preliminary injunction. *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Indeed, the loss of First Amendment rights, even for minimal periods of time, constitutes irreparable harm. *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). The Court need say nothing further as to this factor where it has determined that the loss of First Amendment rights occurred in the form of First Amendment retaliation.

**3**

"The two remaining factors—whether issuing the injunction would harm others and where the public interest lies—merge when the government is the defendant." *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). Because the first two factors weigh in favor of issuing the injunction, it is enough to state simply that neither factor weighs in favor of the Defendants. "If the plaintiff shows a substantial likelihood that the challenged [act] is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment." *Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 274 F.3d 377, 400 (6th Cir. 2001). As to the fourth factor, "the public as a whole has a significant interest in ensuring equal protection of the

15

laws and protection of First Amendment liberties." *Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009). "It is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). Jones has demonstrated that she is likely to succeed on the merits of her retaliation claims arising under the First Amendment, so a preliminary injunction serves the public interest by preventing further violation of constitutional rights.

In summary, all four factors weigh in favor of granting Jones's Motion for a Preliminary Injunction.

**C**

Both parties raise the issue of posting bond in the event that the preliminary injunction goes into effect. Pursuant to Fed. R. Civ. P. 65(c), the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained" While the language of Rule 65(c) reads as a mandatory requirement, "the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). "The strength of the movant's case and the public interest involved can weigh against requiring a bond." *Parton v. Parton*, No. 6:22-cv-00018-GFVT, 2022 U.S. Dist. LEXIS 112032, at *26 (E.D. Ky. June 23, 2022) (citing *Moltan*, 55 F.3d at 1176).

The Defendants do not state the expected financial impact of an injunction or argue in favor of a specific bond amount. This is relevant because typically "a party seeking a security bond . . . estimates the damages it will suffer if it complies with the preliminary injunction." *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins., Co.*, 714 F.3d 424, 432 (6th

16

Cir. 2013). The Sixth Circuit explained the reasoning behind requiring a party seeking a bond to estimate its damages:

> This serves three purposes. It gives the party seeking the injunction a sense of its liability if the injunction is later found to have been unlawful. It provides the court with a basis to set the proper amount (though not necessarily a definitive one). And it furnishes an appellate court with a marker against which to review the district court's determination (though, again, not necessarily an exclusive one).

*Id.*

Given the strength of Jones' likelihood of success on the merits and Defendants' failure to state with particularity the amount of bond they seek, the Court will order Jones to post a bond with the Clerk of the Court in the nominal amount of $100.00 no later than ten (10) days from the Date of this Order. *See Christensen v. Carter*, No. 2:25-cv-1062, 2026 U.S. Dist. LEXIS 7322, at *42 (S.D. Ohio Jan. 14, 2026) (setting $100 in bond in a First Amendment retaliation case involving social media).

### III

School districts enjoy latitude in controlling access to their physical facilities. But as state actors, they cannot retaliate against a parent on the basis of that parent's social media posts which are not threatening, obscene, or defamatory. Because Jones has plausibly shown that she is likely to succeed on the merits of her First Amendment retaliation claim, the Court will grant the preliminary injunction sought. Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Jones' Motion for Preliminary Injunction **[R. 33]** is **GRANTED**.

2. Defendant Jenkins Independent School District Board of Education, its employees, agents, and successors are hereby **PRELIMINARY ENJOINED** from enforcing against Plaintiff Elizabeth Jones:

    a. The "No Trespass Order" dated December 15, 2025; and

    b. The "Modified No Trespass Order" dated February 5, 2026.

3. Jones **SHALL** post a bond with the Clerk of the Court in the amount of $100.00 no later than ten (10) days from the Date of this Order.

This 16th day of July, 2026.

Gregory F. Van Tatenhove
United States District Judge